No. 109,742

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

CHRISTOPHER A. BELONE,
*Appellant*.

SYLLABUS BY THE COURT

1.

The forfeiture by wrongdoing exception to the right of confrontation only applies where the State has proved by a preponderance of the evidence that the defendant's act of wrongdoing was specifically intended to prevent the witness' testimony.

2.

A defendant's prior testimony in a subsequent trial is inadmissible if the prior testimony was compelled by improper admission of evidence that was illegally obtained.

3.

The district court commits reversible error by allowing a late witness endorsement when such endorsement results in surprise or material prejudice to defendant, preventing a fair preparation of his or her defense.

4.

Where the elements of the two offenses are identical, a verdict of not guilty on one count is inconsistent with a verdict of guilty on the other count.

1

5.

A verdict of not guilty on one criminal charge is inconsistent with a verdict of guilty on another criminal charge that includes the same acts necessary to the commission of the crime set forth in the first charge. But an acquittal under a count charging a major offense is not inconsistent with a conviction under a count charging a lesser included offense.

6.

Reckless second-degree murder is the killing of a human being committed unintentionally but recklessly under circumstances manifesting extreme indifference to the value of human life. Involuntary manslaughter is the unintentional killing of a human being committed recklessly. The difference between the two crimes is the degree of recklessness required to prove culpability. Reckless second-degree murder requires proof of extreme indifference to the value of human life.

7.

Verdicts are not inconsistent if they can be reconciled in any manner upon any rational basis.

8.

A verdict, though inconsistent, is not erroneous so long as there is sufficient evidence to support it.

9.

A party may not object at trial to admission of evidence on one ground and then on appeal argue a different ground.

10.

No verdict shall be set aside based upon the erroneous admission of evidence unless an objection was timely interposed and so stated as to make clear the specific ground of objection. Generally, constitutional grounds for reversal are subject to this same rule, and objections raised for the first time on appeal are not properly preserved for appellate review.

11.

Because testimonial hearsay implicates a defendant's constitutional right to confrontation, it may not be introduced into evidence unless a court finds that the declarant is unavailable as a witness and that the defendant had a prior opportunity to cross-examine the declarant.

12.

As a general rule, statements made to health care professionals during the course of treatment are not testimonial; nevertheless, courts must analyze the testimonial nature of the statements in the context in which they were made rather than apply a broad, categorical rule designating all such statements testimonial. A nonexclusive list of the most relevant considerations for establishing the testimonial nature of a victim's statement to a medical provider include whether the provider was a state actor or agent, whether there was an ongoing emergency, whether the encounter was formal, and whether the statements and actions of both the victim and the medical provider reflect a primary purpose focusing on medical treatment or the later prosecution of a crime.

13.

The district judge may terminate the trial and order a mistrial at any time that he or she finds termination is necessary because prejudicial conduct, in or outside the courtroom, makes it impossible to proceed with the trial without injustice to either the defendant or the prosecution.

14.

When a trait of a person's character is relevant as tending to prove conduct on a specified occasion, the evidence may be admitted by the prosecution in a criminal case only after the accused has introduced evidence of his or her good character.

15.

Evidence is exculpatory if it tends to disprove a fact in issue that is material to guilt or punishment or if it may be used to impeach inculpatory evidence of the prosecution. Evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine the confidence of the outcome.

16.

A violation under *Brady v. United States*, 397 U.S. 742, 90 S. Ct. 1463, 25 L. Ed. 2d 747 (1970), does not occur when a defendant or counsel knew about the evidence and could have obtained it prior to or during trial.

Appeal from Douglas District Court; SALLY D. POKORNY, judge. Opinion filed February 20, 2015. Affirmed.

*Christina M. Kerls*, of Kansas Appellate Defender Office, for appellant.

*Patrick J. Hurley*, assistant district attorney, *Charles E. Branson*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before MALONE, C.J., PIERRON and STANDRIDGE, JJ.

STANDRIDGE, J:  In 2007, Christopher A. Belone was convicted of second-degree murder and other crimes relating to the beating death of his girlfriend, Linda Begay. The

Kansas Supreme Court subsequently reversed Belone's convictions and remanded his case for a new trial, where he was convicted of unintentional second-degree murder and violation of a protective order. This is Belone's direct appeal from that second trial. Belone alleges a number of trial errors, some of which he argues deprived him of his constitutional right to a fair trial. Finding no error, we affirm.

FACTS

On July 29, 2006, City of Lawrence Police Officers Anthony Brixius and Micah Stegall responded to Gaslight Village trailer park following reports of criminal damage to property and a possible domestic dispute. Officer Brixius spoke with Keith Bowers, who said Begay showed up at his trailer covered in blood and told Bowers that she had been at Frank Mallonee's trailer when Belone came inside and began beating her with a two-by-four. Bowers took Begay to the hospital.

At the hospital, Begay appeared intoxicated and hysterical. She told hospital staff she had been assaulted by her boyfriend. Begay had a large cut on the bridge of her nose, blood on her face, and bruises on her face, arms, legs, chest, stomach, and buttocks. Begay complained of pain all over but emphasized the pain in her abdomen. A CT scan of Begay's abdomen showed bruising to her duodenum. Begay died on August 1, 2006, from peritonitis caused by blunt force trauma to her abdomen.

The State charged Belone with second-degree murder, kidnapping, obstructing legal process or official duty, and violating a protective order. Following a lengthy trial, the jury convicted Belone as charged. Belone's convictions were affirmed by this court in *State v. Belone*, No. 99,176, 2010 WL 173950 (Kan. App.) (unpublished opinion), *rev. granted* 291 Kan. 913 (2010). On review, the Kansas Supreme Court reversed Belone's convictions and remanded the case for a new trial based on a finding that the district court violated Belone's rights under the Confrontation Clause of the Sixth Amendment to the

5

United States Constitution by admitting into evidence testimonial statements made by Begay to law enforcement in *State v. Belone*, 295 Kan. 499, 285 P.3d 378 (2012).

Following a second trial, which is the subject of this appeal, the jury found Belone guilty of unintentional second-degree murder and violating a protective order. The district court sentenced Belone to a controlling term of 438 months' imprisonment.

ANALYSIS

Belone raises the following issues on appeal with regard to his second trial: (1) the district court violated his Fifth Amendment right to remain silent by admitting into evidence his testimony from the first trial; (2) the district court erred in upholding his conviction for unintentional second-degree murder because the jury also found him not guilty of involuntary manslaughter; (3) the district court violated his Sixth Amendment confrontation rights by admitting into evidence the testimony from a police officer, which created an inference that Begay had identified Belone as her attacker; (4) the district court violated his Sixth Amendment confrontation rights by admitting testimonial hearsay from medical personnel that Begay had identified Belone as her attacker; (5) the district court erred in denying his motion for a mistrial based on the admission of improper character evidence; (6) the State violated his Fourteenth Amendment due process rights by failing to disclose exculpatory evidence prior to trial; and (7) the district court erred by using his prior convictions to increase his sentence without requiring them to be proved to a jury beyond a reasonable doubt. We address each of these arguments in turn.

1. *Admissibility of Belone's testimony from the first trial*

Belone presents two arguments in support of his claim that the district court erred in allowing the transcript of his testimony from the first trial to be read to the jury at the second trial. First, Belone contends the State was substantively barred from introducing

his testimony from the first trial because doing so violated his Fifth Amendment right to remain silent. Second, Belone contends the State was procedurally barred from introducing his testimony from the first trial because the State failed to endorse him as a witness at the second trial.

This court's standard of review for admissibility of evidence is well known:

"When a party challenges the admission or exclusion of evidence on appeal, the first inquiry is relevance. Once relevance is established, evidentiary rules governing admission and exclusion may be applied either as a matter of law or in the exercise of the district judge's discretion, depending on the contours of the rule in question. When the adequacy of the legal basis of a district judge's decision on admission or exclusion of evidence is questioned, an appellate court reviews the decision de novo." *State v. Walters*, 284 Kan. 1, Syl. ¶ 2, 159 P.3d 174 (2007).

Here, there is no dispute that Belone's testimony was relevant. Belone's challenge to the admission of his prior testimony focuses solely on whether the district court's decision to allow it was proper as a matter of law.

Before the first trial, the State filed a motion requesting permission to introduce into evidence the statements Begay made to law enforcement, within which she identified Belone as the individual who had beaten her. The State based its argument on the rule of forfeiture by wrongdoing, which creates an exception to the right of a defendant to confront witnesses testifying at trial. The rule is grounded in the notion that a defendant who obtains the absence of a witness by his or her own wrongdoing forfeits his or her constitutional right to confrontation. See *Belone*, 295 Kan. at 502-03. The district court initially ruled Begay's testimonial statements to the officers were inadmissible because the State failed to meet its burden to prove by a preponderance of the evidence that Belone was responsible for Begay's unavailability by causing her death. At some point not disclosed by the record, however, the district court reversed itself and determined the

7

statements to the officers were admissible because they fit within the forfeiture by wrongdoing exception.

To that end, Officer Brixius testified at the first trial that when he spoke with Begay at the hospital, she reported her boyfriend had beaten her and identified her boyfriend as Belone. Brixius later returned to the hospital and made an audio recording of his interview with Begay, within which she confirmed that Belone was the person who beat her. The recording of the interview was played for the jury.

Belone later took the stand in his own defense. Belone testified that he went to Mallonee's trailer because Mallonee was going to help him build a porch. Belone said that he found Begay in the back bedroom of the trailer naked from the waist down. He claimed he tried to get her dressed, but she attacked him. Belone stated he must have accidentally hit Begay in the nose as they struggled. Belone said that after he tried to clean Begay up in the bedroom, they left in his truck to go home but Begay ultimately jumped out of the truck.

On appeal, our Supreme Court reversed Belone's convictions, holding that the forfeiture by wrongdoing exception did not apply to the statements Begay made to law enforcement officers. The court explained that at the time of Belone's trial, Kansas law only required the State to show by a preponderance of the evidence that the defendant *was responsible for the witness' unavailability* in order to trigger the forfeiture by wrongdoing exception. But after Belone's trial, the United States Supreme Court ruled that the forfeiture by wrongdoing exception only applies when the State has proved by a preponderance of the evidence that the defendant's act of wrongdoing *was specifically intended to prevent the witness' testimony*. *Belone*, 295 Kan. at 503 (citing *Giles v. California*, 554 U.S. 353, 368, 128 S. Ct. 2678, 171 L. Ed. 2d 488 [2008]). Based on the change in applicable law, our Supreme Court held that the district court erred in admitting Begay's testimonial statements to the police because the State did not show that

8

Belone killed Begay for the specific purpose of preventing her from testifying at trial. The court determined that the error was not harmless under the constitutional harmless error test, reversed Belone's convictions, and remanded the case for a new trial. 295 Kan. at 504-05.

At the end of the fourth day of Belone's second trial, the prosecutor advised the district court that the State had no further witnesses but requested permission to wait until the following morning to rest its case. The prosecutor explained the State wanted to make sure all of the exhibits the State intended to introduce into evidence had been offered. The court granted the State's request. Thereafter, the district court spoke with Belone about his right to remain silent and advised Belone that he could have the evening to decide whether he would testify.

Later that night, the State provided the defense with notice of its intent to read Belone's testimony from the first trial to the jury. When trial reconvened the next morning, defense counsel objected to the admission of Belone's testimony from the first trial. In support of his objection, Belone relied on *Harrison v. United States*, 392 U.S. 219, 222, 88 S. Ct. 2008, 20 L. Ed. 2d 1047 (1968), to argue that introducing his testimony from the first trial would violate his Fifth Amendment right to remain silent. Belone also argued that the State was procedurally barred from introducing his testimony from the first trial because the State failed to endorse Belone as a witness at the second trial. The district court overruled Belone's objections, and Belone's prior testimony subsequently was read to the jury.

a. *Right to remain silent*

The Fifth Amendment to the United States Constitution protects an individual from testifying under government compulsion. This protection is waived when an individual voluntarily testifies on his or her own behalf. See *State v. Simmons*, 78 Kan.

9

852, 853, 98 P. 277 (1908). The waiver remains in effect for purposes of a second trial as long as the defendant voluntarily testified at the first trial. *State v. Willcox*, 240 Kan. 310, 313-14, 729 P.2d 451 (1986); *Simmons*, 78 Kan. 852, Syl. ¶ 1. If the defendant's testimony at the first trial was compelled by introduction into evidence of what is later determined to be an illegally obtained prior confession by that defendant, however, the waiver is deemed invalid. *Harrison*, 392 U.S. at 222; *State v. Pabst*, 273 Kan. 658, 665-66, 44 P.3d 1230, *cert. denied* 537 U.S. 959 (2002); see *Willcox*, 240 Kan. at 313-14.

On appeal, Belone seeks to expand the legal circumstances under which a defendant's waiver of the right to remain silent at a first trial is later deemed invalid for purposes of using that testimony at a second trial. Specifically, Belone urges us to hold that if a defendant's testimony at the first trial was compelled by evidence later deemed inadmissible *under any constitutional provision*, the defendant's testimony cannot be used in a second trial unless the State can show that the defendant would have testified regardless of that evidence later deemed inadmissible on constitutional grounds. But Belone seeks more from the Supreme Court's holding in *Harrison* than that case provides.

In *Harrison*, the prosecutor introduced three confessions that the defendant allegedly made while he was in custody. After the confessions were introduced, the defendant took the stand in order to offer his own version of the events in question. Although the jury ultimately found him guilty, the defendant's conviction was reversed on grounds that "[his] confessions had been illegally obtained and were therefore inadmissible in evidence against him." 392 U.S. at 220. On remand, the prosecutor did not offer the illegally obtained confessions but instead offered a transcript of the defendant's previous testimony from the first trial. The trial court admitted that testimony over the defendant's objection, and the jury again convicted the defendant. On appeal, the defendant argued that his testimony from the first trial should have been suppressed because it was "the inadmissible fruit of the illegally procured confessions." 392 U.S. at

10

221. The United States Supreme Court ultimately agreed and reversed the defendant's conviction. In so doing, the Court held that use of the defendant's testimony was problematic because the defendant testified only after the prosecutor had introduced into evidence "three confessions, all wrongfully obtained." 392 U.S. at 222. Critical to our analysis here, the Court held that "impelled" testimony obtained as a result of a Fifth Amendment violation (*i.e.*, the admission of the illegally obtained confessions) was inadmissible as the "fruit of the poisonous tree." 392 U.S. at 222.

It is clear from the "fruit of the poisonous tree" analysis used by the Supreme Court that the holding in *Harrison* applies when a defendant's testimony at the first trial was compelled by the introduction into evidence of what is later determined to be an illegally obtained prior confession by that same defendant. The analysis in *Harrison* is premised on the exclusionary rule. Because the underlying confession was obtained in violation of the constitutional right to be protected from testifying under government compulsion, the government is precluded from introducing the evidence at trial in order to deter the government from engaging in similar violations. Based on the analysis in *Harrison*, the taint that results from introducing the illegally obtained confession into evidence affects that defendant's in-court testimony.

In sum, we construe the holding in *Harrison* to preclude the State from introducing a defendant's prior testimony in a subsequent trial only when the prior testimony was compelled by (1) improper admission of evidence (2) that was illegally obtained, such as through the use of unconstitutional law enforcement practices. Conversely, if a defendant's testimony was compelled as a result of evidence that was *legally* obtained but constitutionally inadmissible, *Harrison* does not operate to preclude use of the testimony in a later trial. Using language regularly associated with the exclusionary rule, legally obtained evidence is not a poisonous tree and therefore cannot taint any fruit it ultimately bears. Therefore, even if a defendant's testimony at the first trial was compelled by evidence later deemed inadmissible because it deprived the

11

defendant of constitutional rights, the defendant's testimony from the first trial does not constitute fruit of the poisonous tree subject to suppression at a subsequent trial under the rule announced in *Harrison*.

Notably, the manner in which we construe the rule in *Harrison* is consistent with the Supreme Court's analysis of the case almost 2 decades later in *Oregon v. Elstad*, 470 U.S. 298, 105 S. Ct. 1285, 84 L. Ed. 2d 222 (1985). In *Elstad*, the defendant argued that statements the police had obtained in violation of the requirements set forth in *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), "tainted" the statements that the defendant had made after being fully advised of and waiving his *Miranda* rights. The Court rejected the defendant's argument that the rule in *Harrison* required the suppression of the statements the defendant made after the appropriate *Miranda* waiver. It explained:

> "This Court has never embraced the theory that a defendant's ignorance of the full consequences of his [or her] decisions vitiates their voluntariness. [Citations omitted.] If the prosecution has actually violated the defendant's Fifth Amendment rights by introducing an inadmissible confession at trial, compelling the defendant to testify in rebuttal, the rule announced in *Harrison v. United States*, 392 U.S. 219[, 88 S. Ct. 2008, 20 L. Ed. 2d 1047] (1968), precludes [the] use of that testimony on retrial. . . . But the Court has refused to find that a defendant who confesses, after being falsely told that his [or her] codefendant has turned State's evidence, does so involuntarily. [Citation omitted.] The Court has also rejected the argument that a defendant's ignorance that a prior coerced confession could not be admitted in evidence compromised the voluntariness of his [or her] guilty plea. [Citation omitted.] Likewise, in *California v. Beheler*, [463 U.S. 1121, 103 S. Ct. 3517, 77 L. Ed. 2d 1275 (1983)], the Court declined to accept defendant's contention that, because he was unaware of the potential adverse consequences of statements he made to the police, his participation in the interview was involuntary. Thus we have not held that the *sine qua non* for a knowing and voluntary waiver of the right to remain silent is a full and complete appreciation of all of the

12

consequences flowing from the nature and quality of the evidence in the case." 470 U.S. at 316-17.

The Supreme Court's opinion in *Elstad* reiterates that the rule of *Harrison* was intended to be limited to those circumstances in which a defendant is compelled to testify at trial as a result of the Fifth Amendment violation that occurs when the defendant's own illegally obtained confession is used against that defendant at trial. See *Harrison*, 392 U.S. at 221 (testimony from first trial should have been suppressed because it was "the inadmissible fruit of the illegally procured confessions"); see also *Littlejohn v. Trammell*, 704 F.3d 817, 849 (10th Cir. 2013) ("By its terms, *Harrison* is applicable only where a defendant's testimony is impelled by the improper use of *his own* unconstitutionally obtained confessions *in violation of the Fifth Amendment*."); *Cosby v. Sigler*, 435 F.3d 702, 707 (7th Cir. 2006) ("Since [the petitioner/defendant's] statement was not illegally obtained, and therefore not improperly admitted, the state bears no . . . burden [under *Harrison*]" to "show[] that her testimony was not compelled by the admission of the statement."); *United States v. Gianakos*, 415 F.3d 912, 919 (8th Cir.) (distinguishing *Harrison* on basis that defendant's testimony "was not the fruit of an illegally obtained confession"), *cert. denied* 546 U.S. 1045 (2005); *United States v. Bohle*, 475 F.2d 872, 876 (2d Cir. 1973) ("We see no reason to extend the 'fruits' doctrine to testimony 'impelled' by mere evidentiary hearsay error, as distinct from unconstitutional police practices."); *State ex rel. LaSota v. Corcoran*, 119 Ariz. 573, 581-82, 583 P.2d 229 (1978) (distinguishing *Harrison* based on fact that evidence which allegedly impelled defendant to testify was improperly introduced, not illegally obtained); *Towe v. State*, 304 Ark. 239, 242, 801 S.W.2d 42 (1990) ("*Harrison* is inapplicable to routine evidentiary rulings."); *State v. Billie*, 881 So. 2d 637, 639 (Fla. Dist. App. 2004) ("The *Harrison* decision . . . creates a special rule applicable solely to the circumstance in which an illegally obtained confession has been introduced, the defendant takes the stand to reply to the illegally obtained confession, and the court is satisfied that the defendant took the stand for that reason and no other."); *Brown v. State*, 153 Md. App. 544, 583, 837 A.2d

13

956 (2003) (appellant's wife's testimony was "'technically inadmissible'" due to general policies of state statutory law and did not infringe upon basic constitutional values or defendant's right to a fair trial), *cert. denied* 380 Md. 618 (2004); *State v. Hunt*, 339 N.C. 622, 638, 457 S.E.2d 276 (1994) ("Even if defendant's testimony at his first trial was induced by evidence which was inadmissible under the rules of evidence, and not because it was unconstitutionally obtained, the *Harrison* exception to the general rule permitting the testimony to be offered at the second trial would not apply.").

Turning to the facts of this case, the Kansas Supreme Court held Begay's statements to the police were inadmissible because introducing them deprived Belone of his constitutional right to confront a witness who, through her pretrial testimonial statements, effectively was testifying against him. The holding that Begay's statements to law enforcement were improperly admitted at Belone's first trial was based solely on evidentiary principles—specifically, a change in the law between the time of Belone's trial and his appeal to the Supreme Court—and not on a determination that the evidence had been illegally obtained. Indeed, defense counsel admitted that the error was "not anything that was egregiously done by the State during the first trial or maliciously or anything like that." In the absence of any evidence that the statements made by Begay to the police were coerced or otherwise obtained in a manner that would violate Belone's statutory or constitutional rights, Belone's testimony from the first trial does not constitute fruit of the poisonous tree subject to suppression at a subsequent trial under the rule announced in *Harrison*.

b. *Endorsing Belone as a witness*

Alternatively, Belone argues his testimony from the first trial was inadmissible because the State never endorsed him as a witness. This issue is reviewed under an abuse of discretion standard, and "the final determination is whether the defendant's rights have been prejudiced." *State v. Allen*, 21 Kan. App. 2d 811, 815, 908 P.2d 1324 (1995), *rev.*

14

*denied* 259 Kan. 928 (1996). A district court abuses its discretion when: (1) no reasonable person would take the view adopted by the judge, (2) a ruling is based on an error of law, or (3) substantial competent evidence does not support a finding of fact on which the exercise of discretion is based. *State v. Huddleston*, 298 Kan. 941, 960, 318 P.3d 140 (2014).

When a criminal case is filed, a prosecutor is required to "endorse the names of all witnesses known" on the charging document. K.S.A. 22-3201(g). At later times prescribed by the court, a prosecutor may endorse additional witnesses that have become known. K.S.A. 22-3201(g). This statute confers broad discretionary power on the trial court in allowing a late endorsement of a witness. *State v. Martens*, 274 Kan. 459, 471, 54 P.3d 960 (2002).

An appellate court will generally uphold a late witness endorsement unless the defendant was surprised and the testimony was critical or, in other words, of "'a climactic and highly damaging nature.'" *Allen*, 21 Kan. App. 2d at 816. Nevertheless, our Supreme Court also has held that it will not condone surprise caused by the intentional withholding of the name of a witness as a part of the prosecution's trial strategy. *State v. Stafford*, 213 Kan. 152, 164, 515 P.2d 769 (1973), *modified* 213 Kan. 585, 518 P.2d 136 (1974). "The purpose of the endorsement requirement is to prevent surprise to the defendant and to give the defendant an opportunity to interview and examine the witnesses for the prosecution in advance of trial." *State v. Shelby*, 277 Kan. 668, 674, 89 P.3d 558 (2004). Thus, "[t]he trial court commits reversible error by allowing a late endorsement when such endorsement results in surprise or material prejudice to defendant, preventing 'a fair preparation of his [or her] defense.'" *State v. Green*, 252 Kan. 548, 553-54, 847 P.2d 1208 (1993).

On appeal, Belone argues he was unfairly surprised and prejudiced by the State's notice that it intended to read his testimony from the first trial. Because Belone's prior

15

testimony was not the product of illegally obtained evidence, however, his testimony from the first trial was voluntary and admissible. Moreover, Belone knew from the outset that the State believed he was a critical witness to the criminal charges alleged against him. Finally, Belone knew better than anyone the facts to which he previously testified. Thus, although perhaps unanticipated, we find no merit to Belone's claim that he was unfairly surprised when given the State's notice that it intended to read his prior testimony into evidence at the second trial.

Of course, even if he could have established unfair surprise, Belone has not shown how the State's notice deprived him of the opportunity to adequately prepare his defense. This is not a situation where the State provided late notice of a previously unknown witness who possessed relevant information about the charges lodged against Belone. Again, Belone knew he was a critical witness to the State and knew better than anyone the facts to which he previously testified. In fact, Belone could have testified in his case-in-chief to explain his prior testimony or further justify his theory of the defense.

In sum, we find no merit to Belone's claim that he was unfairly surprised or prejudiced when given the State's notice that it intended to read his prior testimony into evidence at the second trial.

## 2. *Inconsistent verdicts*

Belone argues his conviction for unintentional second-degree murder must be vacated because it is inconsistent with the jury's finding that he was not guilty of the lesser included offense of involuntary manslaughter. Whether a jury's inconsistent verdicts should result in a new trial is a question of law over which this court exercises unlimited review. See *State v. McKissack*, 283 Kan. 721, 733, 156 P.3d 1249 (2007).

16

The district court provided the jury with several options relating to its verdict as to the killing of Begay. The first option was the principal offense—intentional second-degree murder and was followed by three lesser included offenses: voluntary manslaughter, unintentional second-degree murder, and involuntary manslaughter. Belone's argument centers on the district court's jury instructions for unintentional second-degree murder and involuntary manslaughter. The jury was instructed, in relevant part:

> "In Count I, the defendant is charged with the crime of murder in the second degree—unintentional. The defendant pleads not guilty.
> "To establish this charge, each of the following claims must be proved:
> "1. That the defendant killed Linda Begay unintentionally but recklessly under circumstances showing extreme indifference to the value of life; and
> "2. That this act that caused the death of Linda Begay occurred on or about the 29th day of July, 2006, in Douglas County, Kansas."

The jury was also instructed on the lesser included offense of involuntary manslaughter:

> "If you do not agree that the defendant is guilty of murder in the second degree—intentional, voluntary manslaughter or murder in the second degree—unintentional, you should then consider the lesser included offense of involuntary manslaughter.
> "To establish this charge, each of the following claims must be proved:
> "1. That the defendant unintentionally killed Linda Begay;
> "2. That it was done recklessly; and
> "3. That this act that caused the death of Linda Begay occurred on or about the 29th day of July, 2006, in Douglas County, Kansas."

The jury ultimately returned verdicts of not guilty on the charge of intentional second-degree murder, not guilty on the charge of voluntary manslaughter, guilty on the charge of unintentional second-degree murder, and not guilty on the charge of

17

involuntary manslaughter. After the verdicts were read, the jurors were polled and each individually confirmed the verdicts.

Belone argues, as he did below, that the jury's verdicts were inconsistent. In support of his argument, Belone reasons that (1) the jury's verdict of not guilty for the crime of involuntary manslaughter necessarily means the jury had reasonable doubt as to one or more of the elements of involuntary manslaughter, (2) all of the elements of involuntary manslaughter are included in the crime of unintentional second-degree murder, and so (3) the jury must also have had reasonable doubt as to one or more of the elements of unintentional second-degree murder.

An inconsistent jury verdict is defined as:

"'Where an accused is charged with separate and distinct crimes, although of a similar character, in two or more counts, a verdict of acquittal on one or more counts and of conviction on the others is not ordinarily or necessarily inconsistent, at least where each offense requires different evidence or involves factual variations. When accused is convicted on one count and is acquitted on another count, the test is whether the essential elements in the count wherein accused is acquitted are identical and necessary to proof of conviction on the guilty count.

"'Hence, where the elements of the two offenses are identical, a verdict of not guilty on one count is inconsistent with a verdict of guilty on the other count. *Also, a verdict which acquits accused of a crime which includes acts necessary to the commission of another crime for which he is found guilty is inconsistent.* However, acquittal under a count charging a major offense is not inconsistent with a conviction under a count charging a lesser included offense.'" (Emphasis added.) *State v. Beach*, 275 Kan. 603, 616, 67 P.3d 121 (2003) (quoting 23A C.J.S., Criminal Law § 1407, pp. 347-48).

Belone contends the jury verdict in this case is inconsistent by definition because it falls within the scenario described by the italicized language above: all of the elements

of the crime for which he was acquitted (involuntary manslaughter) are also elements of the crime for which he was convicted (unintentional second-degree murder). We disagree.

Reckless second-degree murder, Belone's crime of conviction, is the killing of a human being committed "unintentionally but recklessly under circumstances manifesting extreme indifference to the value of human life." K.S.A. 21-3402(b). Involuntary manslaughter is the unintentional killing of a human being committed "recklessly." K.S.A. 21-3404(a). "Reckless conduct is conduct done under circumstances that show a realization of the imminence of danger to the person of another and a conscious and unjustifiable disregard of that danger." K.S.A. 21-3201(c). The difference between the two crimes is the degree of recklessness required to prove culpability. Reckless second-degree murder requires proof of "extreme indifference to the value of human life." See *State v. Engelhardt*, 280 Kan. 113, 135, 119 P.3d 1148 (2005); *State v. Pope*, 23 Kan. App. 2d 69, 77, 927 P.2d 503 (1996), *rev. denied* 261 Kan. 1088 (1997). By selecting "guilty" on the verdict form for unintentional second-degree murder and "not guilty" for involuntary manslaughter, the jury clearly expressed its finding that Belone's actions were more than merely reckless; to wit: reckless "under circumstances showing extreme indifference to the value of human life." Verdicts are not inconsistent if they can be reconciled in any manner upon any rational basis. *State v. Meyer*, 17 Kan. App. 2d 59, Syl. ¶ 3, 832 P.2d 357 (1992). For these reasons, we are not persuaded that Belone's conviction for unintentional second-degree murder is inconsistent with the jury's finding that he was not guilty of involuntary manslaughter.

But even if the jury's verdicts were somehow inconsistent, "Kansas courts have repeatedly recognized that the conduct of a jury is sometimes devoid of logic and that inconsistent verdicts may result. Even in cases where the two verdicts are irreconcilable, the convictions will not be reversed on grounds of inconsistency. [Citations omitted.]" *State v. Davis*, 275 Kan. 107, 120, 61 P.3d 701 (2003). A verdict, though inconsistent, is

19

not erroneous so long as there is sufficient evidence to support it. *State v. Herron*, 286 Kan. 959, 966, 189 P.3d 1173 (2008). Belone does not acknowledge this authority or otherwise allege that the evidence was insufficient to support his conviction for unintentional second-degree murder. Accordingly, Belone has waived any argument on this point. See *State v. Holman*, 295 Kan. 116, 125, 284 P.3d 251 (2012) (an issue not briefed by appellant is deemed waived and abandoned).

In a separate argument related to the jury's verdict, Belone challenges whether the jury's finding of guilt on the unintentional second-degree murder charge was truly unanimous. Belone's challenge is based on the involuntary manslaughter instruction, which instructed the jury:  "If you do not agree that the defendant is guilty of murder in the second degree . . . , you should then consider the lesser included offense of involuntary manslaughter." More specifically, Belone argues that if the jury had truly agreed on his guilt for unintentional second-degree murder, the jury would never have considered and then reached a verdict on involuntary manslaughter; instead, the jury would have left the verdict form blank.

Our Supreme Court addressed a similar argument raised in the context of jury instruction error in *State v. Roberson*, 272 Kan. 1143, 1154, 38 P.3d 715, *cert. denied* 537 U.S. 829 (2002), *disapproved on other grounds by State v. Gunby*, 282 Kan. 39, 144 P.3d 647 (2006). The defendant argued that an instruction stating "'[i]f you do not agree that the defendant is guilty'" was erroneous because it required the jury to reject a conviction on the greater charge before considering lesser included offenses. 272 Kan. at 1154. Our Supreme Court rejected this claim because there was nothing in the instruction requiring a unanimous decision on the greater charge before considering the lesser charges. Reading all the instructions together indicated that the "jury was fully and accurately informed that it could consider the lesser offenses." 272 Kan. at 1155.

20

Here, the jury was instructed that the charged offense included lesser offenses and that Belone could be found guilty of the charged offense, a lesser offense, or could be found not guilty. Taking these instructions together with the elements instructions, the jury was fully and accurately informed that it could consider the lesser offense of involuntary manslaughter. There was nothing in the instruction requiring a unanimous decision on the greater offense of unintentional second-degree murder before considering the lesser offense. Simply put, there is no basis on which to conclude the jury had any reasonable doubt as to Belone's guilt of unintentional second-degree murder.

3. *Inferences that could be drawn from Officer Brixius' testimony*

Before Officer Brixius testified, the State proposed that the following special instruction be read to the jury: "'The court has previously ruled that any statements Linda Begay made to law enforcement officer Anthony Brixius are inadmissible hearsay. You should not concern yourselves with the reasons for this ruling.'"

Belone objected to the instruction, arguing that it unnecessarily focused the jury on inadmissible evidence. The district court overruled Belone's objection, noting that without the instruction the jury would be left with the impression that Officer Brixius never interviewed Begay during the course of his investigation. The special instruction was read to the jury prior to Brixius' testimony. During Brixius' direct examination, he stated that the police investigation initially began as one involving criminal damage to property; but after speaking to Begay at the hospital, the focus of the investigation changed to one involving domestic violence. Brixius' testimony continued as follows:

"Q: At that point did you have a suspect?
"A: Yes.
"Q: And who was your suspect?
"A: Mr. Belone."

21

Belone did not object to this testimony.

Belone claims that the special instruction and Brixius' statement that he considered Belone a suspect after speaking to Begay allowed the jury to infer that Begay told Brixius that Belone was her attacker, evidence which the Supreme Court previously ruled inadmissible as violative of his rights under the Confrontation Clause. We decline to reach the merits of Belone's claim, however, because he failed to preserve the issue for appeal by lodging an objection on these grounds following Brixius' testimony. Belone does not acknowledge his failure in this regard; rather, he contends that his objection to the special instruction prior to Brixius' testimony was sufficient to raise the Confrontation Clause issue below. But Belone's objection to the special instruction was lodged before the specific testimony he now challenges on appeal and the objection he did make was not based on a deprivation of rights under the Confrontation Clause. See *State v. Breedlove*, 295 Kan. 481, 490, 286 P.3d 1123 (2012) (party may not object at trial to admission of evidence on one ground and then on appeal argue different ground); *State v. Dukes*, 290 Kan. 485, 489, 231 P.3d 558 (2010) ("[I]t is the defendant's responsibility to 'rais[e] his Confrontation Clause objection.'").

K.S.A. 60-404 provides that no verdict shall be set aside based upon the erroneous admission of evidence unless an objection was "timely interposed and so stated as to make clear the specific ground of objection." See *State v. King*, 288 Kan. 333, 348, 204 P.3d 585 (2009) ("[T]he legislature's intent in enacting K.S.A. 60-404 is clear:  a party must lodge a timely and specific objection to the admission or exclusion of evidence in order to preserve the evidentiary question for review."). Generally, constitutional grounds for reversal are subject to this same rule, and objections raised for the first time on appeal are not properly preserved for appellate review. *State v. Raskie*, 293 Kan. 906, 919, 269 P.3d 1268 (2012); see *State v. Randolph*, 297 Kan. 320, 335, 301 P.3d 300 (2013) (holding that if an appellate court was to overlook the lack of an objection "'because it is necessary to serve the ends of justice or to prevent the denial of [a defendant's] right to a

fair trial, these and other caselaw exceptions would soon swallow the general statutory rule' of K.S.A. 60-404"); *State v. Harris*, 293 Kan. 798, 813, 269 P.3d 820 (2012) (noting disapproval of any past loosening of K.S.A. 60-404 requirement of specific and timely objections). And consistent with this rule, our Supreme Court has declined to address confrontation issues for the first time on appeal. See, *e.g.*, *State v. Williams*, 299 Kan. 509, 548-50, 324 P.3d 1078 (2014); *State v. McCaslin*, 291 Kan. 697, 708-09, 245 P.3d 1030 (2011); *Dukes*, 290 Kan. at 489-90; *State v. Bryant*, 272 Kan. 1204, 1208, 38 P.3d 661 (2002).

Because Belone failed to properly preserve his Confrontation Clause issue, this court will not reach the merits of his argument.

4. *Admissibility of statements Begay made to her nurses*

Next, Belone challenges the district court's decision to allow the jury to consider statements Begay made at the hospital to her nurses that implicated Belone as her attacker. Belone contends these statements constituted testimonial hearsay and violated his Sixth Amendment right to confrontation.

Although this court generally reviews the admission of hearsay evidence for an abuse of discretion, we exercise an unlimited review when the evidentiary ruling in question may have violated an individual's constitutional rights. *State v. Robinson*, 293 Kan. 1002, 1023, 270 P.3d 1183 (2012).

As previously stated, both the Sixth Amendment and the Kansas Constitution Bill of Rights § 10 provide that a criminal defendant has the right to be confronted by the witnesses against him or her. This right bars admission of a specific kind of hearsay, called testimonial hearsay, "unless a court finds that the declarant is unavailable as a witness and that the defendant had a prior opportunity to cross-examine the declarant."

23

*Robinson*, 293 Kan. at 1024. Nontestimonial hearsay, on the other hand, does not implicate a defendant's constitutional right to confrontation. 293 Kan. at 1024. Thus, if the challenged testimony is considered testimonial hearsay, it should not have been admitted into evidence because Belone had no opportunity to cross-examine Begay. But if the challenged testimony is considered nontestimonial hearsay, it did not implicate Belone's constitutional right to confront witnesses against him and the jury was permitted to consider it so long as it was admissible under a recognized exception to the hearsay rule. Because Belone's challenge is limited to whether the statements were testimonial, we need not address the specific hearsay exceptions the district court found applicable to the statements.

The United States Supreme Court has named three "'core class[es]'" of testimonial statements: (1) statements serving as in-court testimony or the functional equivalent of in-court testimony, especially pretrial statements; (2) statements made outside of court but "'contained in formalized testimonial materials'"; and (3) informal statements made outside of court but "'under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.'" *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 310, 129 S. Ct. 2527, 174 L. Ed. 2d 314 (2009). Although the United States Supreme Court has failed to clearly delineate the circumstances embraced by the third class—the class relevant to the present issue—our Supreme Court in *State v. Brown*, 285 Kan. 261, 291, 173 P.3d 612 (2007), named four factors that are key to making that determination:

> "(1) Would an objective witness reasonably believe such a statement would later be available for use in the prosecution of a crime?
> "(2) Was the statement made to a law enforcement officer or to another government official?
> "(3) Was proof of facts potentially relevant to a later prosecution of a crime the primary purpose of the interview when viewed from an objective totality of the circumstances, including circumstances of whether

24

(a) the declarant was speaking about events as they were actually happening, instead of describing past events;

(b) the statement was made while the declarant was in immediate danger, *i.e.*, during an ongoing emergency;

(c) the statement was made in order to resolve an emergency or simply to learn what had happened in the past; and

(d) the interview was part of a governmental investigation?; and

"(4) Was the level of formality of the statement sufficient to make it inherently testimonial; *e.g.*, was the statement made in response to questions, was the statement recorded, was the declarant removed from third parties, or was the interview conducted in a formal setting such as in a governmental building?"

In 2011, our Supreme Court found it necessary to reevaluate the factors set forth in *Brown* based on subsequent opinions issued by the United State Supreme Court that further refined the analysis to be used in deciding the testimonial nature of statements made in the context of medical treatment. See *State v. Miller*, 293 Kan. 535, 567-82, 264 P.3d 461 (2011); *State v. Bennington*, 293 Kan. 503, 509-24, 264 P.3d 440 (2011). In *Miller*, the court was asked to decide whether the statements made by a 4-year-old victim of sex crimes to a sexual assault nurse examiner (SANE) were testimonial. The court began its discussion with the *Brown* factors but noted that numerous other states had examined the testimonial nature of statements made to medical professionals and that "the majority of jurisdictions have determined that when there is a medical purpose to the examination, the statements are nontestimonial." 293 Kan. at 558-59, 562. The *Miller* court then discussed four United States Supreme Court decisions issued after *Brown*, all of which analyzed the Confrontation Clause in the context of statements to medical professionals. In one of these cases, the United States Supreme Court explained that "'only *testimonial* statements are excluded by the Confrontation Clause. Statements to friends and neighbors about abuse and intimidation and *statements to physicians in the course of receiving treatment would be excluded*, if at all, only by hearsay rules.' [Citation omitted.]" 293 Kan. at 568.

25

The *Miller* court ultimately concluded that the United States Supreme Court opinions "suggest a general rule that statements made to health care professionals during the course of treatment . . . would generally not be testimonial because the purpose of such statements is not to produce evidence for use at trial." 293 Kan. at 569. The court further noted, however, the importance of analyzing the testimonial nature of statements "in the context in which they were made, rather than with broad, categorical rules." 293 Kan. at 575. As such, the *Miller* court declined to categorically exclude statements to medical professionals from Confrontation Clause analysis. 293 Kan. at 575-76.

As our Supreme Court recently explained in *State v. Jones*, 295 Kan. 1050, 1056, 288 P.3d 140 (2012):

"[W]hether statements made to a SANE are testimonial is a 'highly context-dependent inquiry.' [Citation omitted.] 'Because the focus is on objective facts, "the relevant inquiry is not the subjective or actual purpose of the individuals involved . . . , but rather the purpose that reasonable participants would have had, as ascertained from the individuals' statements and actions and the circumstances in which the encounter occurred." [Citation omitted.]' [Citation omitted.] Relying primarily on [*Michigan v. Bryant*, 562 U.S. ___, 131 S. Ct. 1143, 1156, 179 L. Ed. 2d 93 (2011)], *Miller* adopted a nonexclusive list of the most relevant considerations for establishing the testimonial nature of a victim's statement to a SANE. Those factors include 'whether the SANE was a State actor or agent, whether there was an ongoing emergency, whether the encounter was formal, and whether the statements and actions of both [the victim] and the SANE reflect a primary purpose focusing on the later prosecution of a crime.' [Citation omitted.]"

Although *Miller* addressed statements made to a SANE, the same analysis would logically apply to statements made to any medical professional, with the same emphasis on whether the statements and actions reflected a primary purpose of medical treatment or a primary purpose of later prosecution of a crime.

In this case, the district court ruled before trial that certain statements Begay made to medical personnel were nontestimonial and, therefore, did not implicate Belone's constitutional confrontation rights. Specifically, the court found that the particular statements at issue were not made for the purpose of an investigation, as Begay never mentioned Belone's name or provided any information that would aid in any investigation or prosecution of Belone. On appeal, Belone challenges the admission of statements Begay made to nurses Karin Feltman and Robert Bond.

a. *Begay's statements to Karin Feltman*

When Begay arrived at the emergency room on July 29, 2006, Feltman was her primary nurse. Feltman described Begay's demeanor as "very hysterical," screaming, and crying. Feltman said Begay was intoxicated but "clinically sober" and was alert, oriented, and answering questions appropriately. While Feltman examined Begay's numerous injuries, Begay said that her boyfriend had beaten her, but she never stated his name. Feltman reported that Begay repeatedly said, "'He threw me to the ground. He threw me on the ground. He shoved me. He beat me with a fucking stick. He hit me with a log. He flung me around by my hair. He shoved me down.'" Feltman also reported that Begay complained of throat pain. When Feltman tried to ascertain whether the pain was from swallowing, Begay responded that her throat was swollen and that "he" grabbed Begay by the throat and shoved her up against the wall. Feltman also stated that Begay complained of head pain and that her scalp was tender to the touch. Begay told Feltman, "'He flung me around by my hair.'"

Belone alleges that Begay's statements to Feltman were testimonial because, although not made to law enforcement, Begay's repeated use of the term "he" and her reference to her "boyfriend" as the attacker demonstrate that Begay wanted people to know who had beaten her. Belone claims that because Begay indirectly identified him as her attacker, the statements were made for the purpose of prosecuting him.

27

Using the analysis set forth by our own Supreme Court and the United States Supreme Court, however, we find Begay's statements to Feltman were not testimonial in nature. Although Begay did tell Feltman when she arrived at the hospital that her boyfriend had beaten her, she did so in the context of describing the nature of her injuries. Begay's statements were not made to law enforcement or any other government official in any type of formal interview. Instead, Begay's statements served as an explanation of her physical condition when she arrived at the emergency room. Begay did not ask Feltman to call the police and did not provide Feltman with Belone's name or any other identifying information about Belone. Under these facts, an objective witness would likely believe that Begay's statements existed only to explain her injuries to an emergency room nurse. Nothing in the record suggests that the statement carried any kind of investigative formality or that either Begay's or Feltman's primary purpose in the conversation was to preserve the events for future prosecution. As such, the district court's decision to admit the hearsay statements did not violate Belone's rights under the Confrontation Clause.

### b. *Begay's statements to Robert Bond*

Bond was Begay's nurse on the evening of July 30, 2006. Bond observed a laceration on Begay's nose and bruising on her arms, stomach, and face. Bond testified that he always asked his patients what happened to them and when he asked Begay, she responded that she had "passed out after drinking and woke up to being beaten with a 2x4." Although Begay told Bond that her boyfriend was the person who beat her, she did not say who her boyfriend was or identify him by name.

Belone argues that Begay's statements to Bond were testimonial. Specifically, Belone claims that the statements were made for the purposes of prosecution because Bond testified in the first trial that Begay also told him that her boyfriend "should be in jail for what he did."

28

Using the analysis set forth by our own Supreme Court and the United States Supreme Court, however, we find Begay's statements to Bond were not testimonial in nature. Even taking into account Begay's statement at the first trial that her boyfriend should be in jail for what he did, Begay's statements were made in response to Bond's questioning about what had happened to her. Begay's statements were not made during a formal interview, and they were not made in the presence of law enforcement or any other government official. Begay did not ask Bond to call the police or provide Bond with Belone's name or any other identifying information about Belone. Under these facts, an objective witness would likely believe that Begay's statements existed only to explain her injuries to her nurse. Again, there is nothing in the record to suggest that the statements carried any kind of investigative formality or that either Begay's or Bond's primary purpose in the conversation was to preserve the events for future prosecution. As such, the district court's decision to admit the hearsay statements did not violate Belone's rights under the Confrontation Clause.

5. *Motion for mistrial*

Belone argues the district court erred in denying his motion for mistrial after the State improperly elicited bad character evidence from a witness in violation of K.S.A. 60-447(b) (evidence of a trait of an accused's character tending to prove guilt or innocence). K.S.A. 22-3423(1)(c) provides that "[t]he trial court may terminate the trial and order a mistrial at any time that he [or she] finds termination is necessary because . . . [p]rejudicial conduct, in or outside the courtroom, makes it impossible to proceed with the trial without injustice to either the defendant or the prosecution."

On appeal, a district court's decision denying a motion for mistrial is reviewed under an abuse of discretion standard. Judicial discretion is abused if the judicial decision (1) is arbitrary, fanciful, or unreasonable; (2) is based on an error of law; or (3) is based on an error of fact. *Harris*, 293 Kan. at 814. In evaluating a motion for mistrial, this court

must first determine whether the district court abused its discretion in deciding if there was a fundamental failure in the proceeding. Secondly, we must decide whether the district court abused its discretion in deciding whether the conduct resulted in prejudice that could not be cured or mitigated through jury admonition, instruction, or other action. *State v. McCullough*, 293 Kan. 970, 980, 270 P.3d 1142 (2012); *Harris*, 293 Kan. at 814-15. Additionally, an appellate court exercises de novo review of a challenge to the adequacy of the legal basis of a district judge's decision on admission or exclusion of evidence. *State v. Holman*, 295 Kan. 116, Syl. ¶ 6, 284 P.3d 251 (2012).

At trial, Mallonee testified that he lived across the street from Belone and Begay. Mallonee stated that in the early morning hours of July 29, 2006, Begay came to his door. The two "'played around a little bit,'" and Begay passed out in one of the bedrooms. Later on, Belone knocked on Mallonee's door. Mallonee did not let Belone come inside because Begay was there and Mallonee did not want them to argue. Instead, Mallonee walked with Belone to Belone's trailer and then got in Belone's truck and the two went to buy some beer. After returning to the trailer park, they drank beer in Belone's truck before Mallonee left and went to another trailer nearby. Mallonee testified that "quite some time" later, he saw Begay standing in the middle of the street with blood all over her face. Mallonee said that when he saw Begay, he did not do anything to help her "[b]ecause . . . [Belone] was around there. He was probably just up the street, and I didn't trust him. He could have a gun or—because I think he was after me, too." Defense counsel objected, and the following discussion took place outside the hearing of the jury:

> "MR. ROBINSON [defense counsel]:  Your Honor, I'm going to object. This is propensity evidence. There is nothing at all suggesting—there is no evidence before this court that Christopher Belone did anything. The State just elicited from Mr. Mallonee that, oh, I was afraid of Chris, too. I didn't want him beating me up. There is no evidence Chris even did it at this point.
> "They are eliciting—there is no foundation. There has been nothing laid by this witness that he saw anything, that he knew anything, that Christopher Belone did

30

anything, and now all we're getting in is what—the prior bad acts. Is that what we're doing because of his knowledge and history of Chris? Because that's exactly what they just got out, and that's what I have been fighting this whole trial about, to say we need to keep this out and they just elicited it.

"MS. KEMPLE [the prosecutor]: That was not a prior bad act at all. It was not an act that Christopher did at all. There was no alleged act that he did. He said I did not do a certain thing because I was afraid of a certain situation. And that's what he was speaking to.

"MR. ROBINSON: He said, 'I was afraid he would come get me, too.' That's what he said. He didn't say he was afraid of a situation. He said he was afraid the defendant would come get him, and that's just what they elicited.

"THE COURT: One, I don't think the State elicited that. Seemed pretty spontaneous to me. Two, he's just giving his state of mind. He's not mentioning a prior bad act. He's saying this is what his relationship or reaction to Mr. Belone is or was.

"Now I do caution the State. That's it. Okay.

"MS. KEMPLE: Uh-huh.

"THE COURT: Exploring that—

"MR. ROBINSON: I can't explore it.

"THE COURT: You can if you want to.

"MR. ROBINSON: I can't, because as soon as I do that, well, Judge, he opened the door again.

"And the thing is, this is self-serving statements. If he has motive. And the Government dang well knows what my position is in reference to Mr. Mallonee, so that's self-serving to say I'm afraid of him, but I'm a good guy, so I'm sitting up here drunk on my porch so I can't come back at him. Now I can't—unless I open the door to everything that we are trying to keep out of this trial. So based on his statement, I ask for a mistrial.

"THE COURT: Denied. Go ahead."

In explaining his objection to the district court, Belone appeared to argue the testimony was inadmissible as a prior bad act under K.S.A. 60-455, which prohibits evidence of prior crimes or civil wrongs "on a specified occasion" from being admitted to prove a defendant's propensity to commit the charged crime. *State v. Garcia*, 285 Kan. 1, 12, 169 P.3d 1069 (2007). On appeal, however, Belone does not challenge the district

31

court's ruling as a violation of K.S.A. 60-455. Instead, Belone argues the testimony constituted improper character evidence under K.S.A. 60-447, introduced for the purpose of showing that he was untrustworthy and had a propensity for violence.

A party may not object at trial to the admission of evidence on one ground and then on appeal argue a different ground. *Breedlove*, 295 Kan. at 490; see *King*, 288 Kan. at 342 (purpose of rule in K.S.A. 60-404 requiring a timely and specific objection is to give district court opportunity to consider as fully as possible whether evidence should be admitted and therefore reduce chances of reversible error); *State v. Johnson*, 266 Kan. 322, 335-36, 970 P.2d 990 (1998) ("'The specific grounds for an objection must be given at trial to preserve an issue for appeal.'"). Because Belone failed to properly preserve this issue below, he has waived this argument on appeal. See *State v. Richmond*, 289 Kan. 419, 428-30, 212 P.3d 165 (2009) (declining first-time appellate review of K.S.A. 60-447 claim when trial counsel failed to assert statute as grounds for objection).

Even if this court were to reach the merits of Belone's K.S.A. 60-447 argument, however, he is still not entitled to relief. K.S.A. 60-447 provides, in relevant part, that "when a trait of a person's character is relevant as tending to prove conduct on a specified occasion," the evidence may be admitted by the prosecution in a criminal case "only after the accused has introduced evidence of his or her good character." K.S.A. 60-447(b)(ii). But the statement made by Mallonee in his testimony does not constitute character evidence tending to prove that Belone was untrustworthy or violent. Rather, the statement reflected Mallonee's state of mind, indicating that Mallonee was understandably afraid that Belone had found out about his interaction with Begay and would be coming after him next.

Because Belone fails to establish a fundamental failure at trial relating to the admission of Mallonee's testimony, the district court did not abuse its discretion in denying Belone's motion for mistrial on this basis.

32

6. *Disclosing of exculpatory evidence*

Belone contends the State violated his rights under *Brady v. Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), by failing to disclose exculpatory evidence prior to trial. Although we exercise unlimited review over the district court's decision as to the existence of a *Brady* violation, we give deference to the district court's findings of fact. *State v. Warrior*, 294 Kan. 484, Syl. ¶ 13, 277 P.3d 1111 (2012).

"[S]uppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87.

> "There are three components or essential elements of a *Brady* violation claim: (1) The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) that evidence must have been suppressed by the State, either willfully or inadvertently; and (3) the evidence must be material so as to establish prejudice." *Warrior*, 294 Kan. 484, Syl. ¶ 10.

During a search of the crime scene in Mallonee's trailer, law enforcement collected a blue shirt and a white shirt, each of which had blood stains. At trial, Alan Mattox, a forensic scientist for the Kansas Bureau of Investigation, testified for the State. During Mattox's direct examination, defense counsel noticed that Mattox appeared to be referring to notes. Defense counsel objected on grounds that the defense had not been provided the notes. The prosecutor responded that she had never seen the notes either and that the State did not have access to them during discovery. The district court called a recess in order to allow defense counsel an opportunity to examine the notes. Upon examination, defense counsel discovered a "printout phone log" reflecting communication between Mattox and the prosecutor related to forensic testing of the shirts found in Mallonee's trailer. The phone log read as follows:

33

"[Mattox:] 'One last question. Do we need to collect samples to try to determine who was wearing the shirts? For example, if a shirt is left at a burglary without bloodstains, we would collect the collar area to try to detect a DNA profile. Let me know ASAP.'

"[The prosecutor:] . . . 'No, there is no need to determine who was wearing the blue or white shirts. It's our understanding that they were already at the crime scene, left there by the previous occupant of the room. It appears to us that there is blood on them and so just test one test sample of the blood on each shirt. And, of course, whose blood, DNA is all we really need. So yes, only a representative sample needs to be tested, not all stains.'"

Defense counsel argued that this information was exculpatory because the State was trying to use the shirts as a basis to link Belone to the crime scene. Defense counsel claimed the phone log should have been turned over to the defense because it supported an inference that the State already had determined the shirts belonged to someone other than Belone. Belone contends that if he had been made aware of this information, he could have had more testing done on the shirts. In response, the prosecutor argued that Belone already knew the State believed the shirts belonged to someone other than Belone. The prosecutor explained that before the first trial, the State was under the impression that the shirts found at the crime scene belonged to the previous occupants of Mallonee's trailer, Shelly Welcher or her children. The State later learned during Belone's testimony that the white shirt found at the scene belonged to him. The prosecutor argued the information in the phone log was not new evidence because the log had always been available to Belone, the State had endorsed Mattox as a witness, the shirts already had been admitted into evidence at the first trial, and the shirts were available to Belone for independent testing.

The district court ruled that the information relating to the prosecutor's opinion about the shirts did not constitute a *Brady* violation. Specifically, the court held that speculation on the part of Belone that further testing could have produced exculpatory

34

evidence does not qualify as *Brady* evidence. The court also noted that the defense had access to the shirts, the defense could have had them tested independently, and the report detailing the testing done was available to the defense during the first trial. The court also ruled that the information was not discoverable because it was not part of the expert report.

As to the first *Brady* element, Belone argues that the phone log was exculpatory because the State's belief that the shirts belonged to someone else indicated a lack of evidence placing him at the scene of the crime. Evidence is exculpatory if it tends to disprove a fact in issue that is material to guilt or punishment or if it may be used to impeach inculpatory evidence of the prosecution. See *Giglio v. United States*, 405 U.S. 150, 154, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972); *State v. Lackey*, 295 Kan. 816, 823, 286 P.3d 859 (2012). "[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. '"A reasonable probability is a probability sufficient to undermine the confidence of the outcome."'" *Haddock v. State*, 282 Kan. 475, 507, 146 P.3d 187 (2006).

On this first element, we agree with the district court that the information in the phone log did not constitute exculpatory evidence. That the State may have initially believed the shirts at the crime scene belonged to someone else does not disprove Belone was present in the bedroom at the time the crime was committed. And if additional testing of the shirts had revealed the presence of another individual's DNA, that evidence would not have disproved Belone's presence either. There was no evidence in the record to support a finding that further testing could have produced exculpatory evidence.

As to the second element, we find no evidence to establish that the information in the phone log was ever suppressed by the State. Belone was already aware that the State initially believed the shirts belonged to someone else. At the first trial, Officer Brixius testified he found a blue shirt and a white shirt in Mallonee's trailer. Welcher testified that

the clothes on the floor of Mallonee's trailer belonged to her children and that the blue shirt belonged to her son. Testimony from detectives indicated that Belone was wearing a black mesh shirt when he was booked into jail. Belone later testified that the white shirt belonged to him, and he gave it to Begay to help stop her nose from bleeding. Before Belone's testimony, there was no evidence in the record to suggest that the State was aware the white shirt belonged to Belone.

Moreover, there was no evidence to suggest that the State was untruthful in reporting that it was not aware the phone log existed. Instead, the record reflects that the State never had access to the information contained in Mattox's notes. In response to defense counsel's objection, the prosecutor claimed that the State did not have Mattox's notes containing the phone log because they were Mattox's work product. Belone does not challenge this fact on appeal. Additionally, a *Brady* violation does not occur when a defendant or counsel knew about the evidence and could have obtained it prior to or during trial. *State v. Walker*, 221 Kan. 381, 384, 559 P.2d 381 (1977); *State v. Wilson*, 41 Kan. App. 2d 37, 53, 200 P.3d 1283 (2008).

Nevertheless, Belone claims that the phone log was clearly prejudicial to his defense because, in the absence of his ability to review the information set forth in the log, he testified at the first trial that the white shirt found in Mallonee's trailer belonged to him. If this information had been provided to him prior to his testimony, Belone alleges that the defense strategy might have been different. Belone also notes that this admission was used against him at the second trial when a detective testified about a comparison analysis of the white shirt found at the crime scene and a video of a shirt worn by Belone on the day of Begay's attack. As previously discussed, however, Belone has failed to establish that the information in the phone log was so material to his defense; in other words, Belone has failed to establish that there is a reasonable probability that the result of the trial would have been different had the phone log been provided to the defense.

36

In an alternative argument made for the first time on appeal, Belone also argues that he was entitled to receive the phone log pursuant to K.S.A. 22-3213(2), which provides: "After a witness called by the state has testified on direct examination, the court shall, on motion of the defendant, order the prosecution to produce any statement (as hereinafter defined) of the witness in the possession of the prosecution which relates to the subject matter as to which the witness has testified." But Belone failed to make this argument below when he raised the *Brady* issue, and he provides no support to show that he ever moved for production under the statute at any time following Mattox's testimony at the first trial. Issues not raised before the district court cannot be raised on appeal. *State v. Johnson*, 293 Kan. 959, 964, 270 P.3d 1135 (2012).

7. *Criminal history*

Finally, Belone argues his sentence was unconstitutional under *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000), because it was enhanced based on a criminal history that was not proved to a jury beyond a reasonable doubt. Belone concedes in his brief that the Kansas Supreme Court has previously rejected this claim in *State v. Ivory*, 273 Kan. 44, 41 P.3d 781 (2001). This court is duty bound to follow Kansas Supreme Court precedent, absent some indication the court is departing from its previous position. *State v. Ottinger*, 46 Kan. App. 2d 647, 655, 264 P.3d 1027 (2011), *rev. denied* 294 Kan. 946 (2012). Our Supreme Court recently reaffirmed its holding in *Ivory*, ruling that the use of prior convictions to enhance a sentence is constitutional and does not violate *Apprendi*. *State v. Baker*, 297 Kan. 482, Syl. ¶ 4, 301 P.3d 706 (2013). Accordingly, there is no merit to Belone's argument on this point.

Affirmed.

37