NOT DESIGNATED FOR PUBLICATION

No. 113,145

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

MARQUATESZ R. REDMON,
*Appellant*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; GREGORY L. WALLER, judge. Opinion filed September 23, 2016. Affirmed.

*Carl F.A. Maughan*, of Maughan Law Group LC, of Wichita, for appellant.

*Lance J. Gillett*, assistant district attorney, *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before POWELL, P.J., ARNOLD-BURGER, J., and WALKER, S.J.

*Per Curiam*:  Defendant Marquatesz R. Redmon takes this appeal from his four convictions and sentences resulting in his prison commitment of 732 months. Finding no errors, we affirm.

FACTS

All parties in this case agree that the charges in this case arose out of horrible facts. On the evening of June 6, 2013, 76-year-old W.S.B., a widow who lived alone in her Wichita home, endured a horrendous ordeal after waking up when a strange man

1

came into her bedroom and jumped on top of her while holding a knife. W.S.B. was not wearing her glasses, so she could not see the man. She could, however, see that he was wearing blue jeans and a black shirt with lettering on it. The man put a pillow over W.S.B.'s head and removed her clothes. When she complained that she could not breathe, the man replied, "[G]ood, then I won't have to shoot you." The man asked W.S.B. several questions, confirming that her husband was dead, she did not have an emergency call necklace, and she did not have AIDS. The man then vaginally raped her repeatedly, first with four fingers and then with his penis, causing her extreme pain. As he did so, W.S.B. could tell the man was wearing what seemed to be fingerless gloves. He also called W.S.B. a "fucking bitch" several times in between him repeatedly saying, "savage, savage, savage," and "Megan, Megan." The man asked W.S.B. whether it felt good, and insisted that W.S.B. tell him it did and it was the best sex she ever had, but she refused. W.S.B. eventually urinated involuntarily, angering the man; so he knocked W.S.B. down into the tight space between her bed and the wall. W.S.B. knew that there was also another man in her house because she could hear them talking. However, she could not identify either man.

Several items were taken from W.S.B.'s person and home. The man took W.S.B.'s wedding band from her hand, warning her that if she did not give it to him he would cut off her hand. W.S.B. also gave him her watch and gold bracelet that she was wearing and later discovered she was missing some other gold jewelry her husband had given her. W.S.B.'s televisions and several other items were also stolen. Before he left, the man who had raped her threatened to come back and kill W.S.B. if she called the police. The men took two of W.S.B.'s televisions, including a 52-inch TV.

After the men left her home, W.S.B. waited a few minutes, put on a robe, and went across the street to the home of her close friends and neighbors who called the police. W.S.B. went to the hospital by ambulance, where a rape kit was performed.

W.S.B.'s ensuing reports of what happened to her as told to her neighbor and the police were mostly consistent with her trial testimony described above. Her sexual assault examination revealed numerous injuries consistent with her description of events as well.

The extensive police investigation corroborated W.S.B.'s reports. Her home's basement window was broken and propped open, as was the door to her garage, which appeared to have been kicked in. The rear entry door to the home had also been propped open. The home's contents were strewn about, furniture was knocked over, and her cable to the TV had been cut.

Fingerprints found in the home led the police to identify Redmon and John Thompson as suspects. Specifically, prints from Redmon's fingers and palm were found on a plastic storage bin in the living room. Late the next day, Redmon and Thompson were eventually arrested after initially refusing a request from police to come out of Redmon's girlfriend's home, which was just a couple of blocks from W.S.B.'s home.

Redmon voluntarily spoke to the police after waiving his *Miranda* rights but denied any involvement. Redmon told the police that on the night of W.S.B.'s attack, he and Thompson were walking around the neighborhood when Thompson pointed out W.S.B.'s home. Thompson then broke the basement window, entered the home, and came to the door to let Redmon inside. Redmon initially reported that Thompson waited 4 to 5 minutes before letting him in but later changed the time he waited to 20 to 30 minutes. Thompson initially told police that he only went inside the house for a short period of time, trying to get Thompson to leave, and then went back outside.

Once Redmon and Thompson left the home, they returned to Redmon's girlfriend's house, where Thompson went to sleep on the couch and Redmon slept with his girlfriend. When asked if the word savage or name Megan meant anything to him, Redmon told police that his dog's name was Savage, and his girlfriend's sister in Kansas City was

3

named Megan. Redmon admitted to police that his fingerprints would be found on a box of hats that he tripped over while in the house. Redmon believed Thompson was wearing gloves. Redmon insisted that he did not know anyone was in the house, that he never saw or heard anything, and that nothing was taken from the house.

A search of Redmon's girlfriend's home pursuant to a search warrant uncovered evidence that connected Redmon to the crimes against W.S.B. During their search, police found a gun wrapped in a trash bag hidden in the toilet. They also found several items of jewelry in the trash that W.S.B. identified as having been stolen from her. The police never located her other stolen property, including the TVs. The search also uncovered a black Jordan brand sweatshirt with white writing on it in the bedroom where Redmon and his girlfriend slept and several pairs of fingerless gloves were found throughout the residence.

Forensic testing also connected only Redmon to the crimes. The police collected Thompson's and Redmon's clothing and DNA samples. They also collected DNA samples from W.S.B., an associate of Redmon's, and Redmon's girlfriend. A forensic scientist who conducted testing on that evidence testified that W.S.B., Redmon, and Redmon's girlfriend could not be excluded as contributors to the DNA profile found in biological material removed from the crotch of Redmon's boxer shorts. The forensic scientist also could not exclude W.S.B. and Redmon's girlfriend as the two contributors to combined DNA found in blood discovered on the waistband of Redmon's boxers.

Redmon was 17 years old at the time the crimes were committed, so he was charged as a juvenile with rape, aggravated robbery, and aggravated burglary. The State moved to prosecute Redmon as an adult pursuant to K.S.A. 2012 Supp. 38-2347(a)(2).

After 3 days of hearings conducted in August 2013 and January 2014, the trial court granted the State's motion, finding each of the statutory factors that can inform such

4

decisions set out in K.S.A. 2012 Supp. 38-2347(e) were satisfied in Redmon's case. The trial court also found Redmon was the primary offender based on the DNA evidence, and Thompson was the aider and abettor.

The trial court subsequently arraigned Redmon on a total of seven counts, charged in the State's information as a single count of rape and alternative counts of aggravated burglary, aggravated robbery, and criminal threat or aggravated intimidation of a witness. The matter eventually proceeded to a 5-day jury trial. The State's evidence offered at trial is summarized above. Redmon testified in his own defense, pointing the finger at Thompson as the person who initiated and carried out these crimes against W.S.B. Redmon never denied being in the house that night and admitted to helping Thompson burglarize the house. He also repeated his report to the police that he tripped over the plastic storage bin on the floor and replaced its lid. And Redmon even admitted that he lied to the police, explaining that he was scared and did not want to get in trouble. Redmon, however, consistently denied that he ever saw or in any way helped Thompson sexually assault W.S.B.

The jury returned guilty verdicts on all charges. The trial court subsequently denied Redmon's posttrial motions for acquittal and new trial and adjudged him guilty of those charges. Upon the State's election of charges, the trial court denied Redmon's motion for a downward durational or dispositional departure and imposed consecutive, aggravated presumptive sentences for each of Redmon's four convictions totaling 732 months as follows: 618 months for rape, 34 months for aggravated burglary, 61 months for aggravated robbery, and 19 months for aggravated intimidation of a witness.

Redmon has timely appealed, raising five issues.

ANALYSIS

*Cruel and unusual punishment*

As his principal contention on appeal, Redmon argues that his 732-month aggregated term-of-years sentences categorically constitutes cruel and unusual punishment when imposed on juvenile offenders charged in adult court.

This main issue contains three subissues. First, Redmon argues his aggregated sentences, which he likens to a hard 50 sentence or sentence of life without parole, categorically violate the protections against cruel and unusual punishment under the Eighth Amendment to the United States Constitution. Redmon also mentions in his issue statement that his sentences violate similar protections found in § 9 of the Kansas Constitution Bill of Rights. But he has not briefed that separate issue, so he has abandoned it. See *State v. Boleyn*, 297 Kan. 610, 633, 303 P.3d 680 (2013) (issues not briefed on appeal deemed waived or abandoned). Finally, Redmon suggests that his sentence is illegal because it fails to conform to K.S.A. 2015 Supp. 21-6618. His two briefed arguments will be considered here in turn.

*Eighth Amendment*

The Eighth Amendment directs that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." Its protections have been extended to the states under the Fourteenth Amendment. See *Furman v. Georgia*, 408 U.S. 238, 239, 92 S. Ct. 2726, 33 L. Ed. 2d 346 (1972). Notably, the Eighth Amendment "does not require strict proportionality between a crime and a sentence; rather, it forbids only an extreme sentence that is grossly disproportionate to the crime." *State v. Woodard*, 294 Kan. 717, 721, 280 P.3d 203 (2012).

6

Claims that a term-of-years sentence is disproportionate in violation of the Eighth Amendment's prohibition of cruel and unusual punishment generally fit into one of two categories: (1) "challenges that argue the term of years is grossly disproportionate given all the circumstances in a particular case," *i.e.*, a case-specific challenge; and (2) "cases in which the court implements the proportionality standard by certain categorical restrictions," *i.e.*, a categorical challenge. *State v. Gomez*, 290 Kan. 858, Syl. ¶ 4, 235 P.3d 1203 (2010). Case-specific challenges require factual findings not made in this case. Thus, Redmon focuses this argument, which he has newly raised on appeal, on a categorical challenge to his sentences as disproportionate in violation of the Eighth Amendment.

Redmon contends his aggregate sentences—which he variously characterizes as the functional equivalent of a hard 50 sentence, a sentence of life in prison without the chance of parole, or a death penalty sentence—constitute disproportionate punishment in violation of the Eighth Amendment when imposed on juveniles charged as adults. He bases his argument on the reasoning of the United States Supreme Court in a trilogy of cases that have addressed Eighth Amendment challenges to particular sentences imposed on juveniles.

In the first of those cases, *Roper v. Simmons*, 543 U.S. 551, 555, 568, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005), the Court categorically banned capital punishment for all juvenile offenders. Next, in *Graham v. Florida*, 560 U.S. 48, 79-80, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010), the Court categorically banned life imprisonment without the possibility of parole for juvenile nonhomicide offenders. And most recently, in *Miller v. Alabama*, 567 U.S. ___, 132 S. Ct. 2455, 2460, 183 L. Ed. 2d 407 (2012), the Court held that *mandatory* sentencing schemes that impose a term of life imprisonment without parole on all juvenile homicide offenders, thereby eliminating consideration of the offender's youth as mitigating against such a severe punishment, constitute disproportionate punishment in violation of the Eighth Amendment. *Miller* did not,

however, "foreclose a sentencer's ability [to sentence a juvenile to life without parole] in homicide cases, [but] require[s] it to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." 132 S. Ct. at 2469.

Kansas courts have applied the reasoning of these United States Supreme Court cases in various contexts. See, *e.g.*, *State v. Dull*, 302 Kan. 32, 61, 351 P.3d 641 (2015) (deeming imposition of mandatory lifetime postrelease supervision on juvenile offender categorically unconstitutional), *cert. denied* 136 S. Ct. 1364 (2016); *State v. Brown*, 300 Kan. 542, 564, 331 P.3d 781 (2014) (Quoting *Graham*, 560 U.S. at 75, in holding "hard 20 life sentence [for a felony-murder conviction] does not irrevocably adjudge a juvenile offender unfit for society. Rather, in line with the concerns expressed in *Graham*, it gives the offender a 'meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation' by permitting parole after the mandatory 20-year minimum prison term is served.").

*Issue preservation*

The State urges this court to find that Redmon abandoned his Eighth Amendment categorical challenge by failing to adequately explain why this court should reach the merits of this issue the first time on appeal. That obligation on appellants arises under Kansas Supreme Court Rule 6.02(a)(5) (2015 Kan. Ct. R. Annot. 41), which, by its plain language, obligates an appellant to explain in his or her brief why an issue not raised below is properly before the appellate court. This means Redmon must affirmatively explain why this court should apply an exception to the general rule that an appellate court generally will not consider constitutional issues raised for the first time on appeal. Generally recognized exceptions include: (1) the issue involves only a question of law arising on proved or admitted facts and is determinative of the case; (2) consideration of the issue is necessary to serve the ends of justice or to prevent the denial of fundamental

8

rights; or (3) the district court is right for the wrong reason. *State v. Phillips*, 299 Kan. 479, 493, 325 P.3d 1095 (2014). It is now firmly established that our appellate courts will strictly enforce this rule and find an issue abandoned where compliance is lacking. See *State v. Godfrey*, 301 Kan. 1041, 1043-44, 350 P.3d 1068 (2015) (citing *State v. Williams*, 298 Kan. 1075, 1085, 319 P.3d 528 [2014], in stressing that "Rule 6.02[a][5] means what it says," will be "strictly enforced," and "is ignored at a litigant's own peril").

The State raises a valid point. After acknowledging that he did not make this argument below, Redmon states simply: "A categorical challenge under the Eighth Amendment may be presented for the first time on appeal. See *State v. Gomez*, 290 Kan. 858[, 235 P.3d 1203] (2010)." Our Supreme Court did at least *consider* in *Gomez* whether the defendant could challenge his life sentence as cruel and unusual punishment under the Eighth Amendment for the first time on appeal under one of the above-stated exceptions to the preservation rule (referred to in *Gomez* as the *Pierce* exceptions). 290 Kan. at 862 (citing *Pierce v. Board of County Commissioners*, 200 Kan. 74, 80-81, 434 P.2d 858 [1967]). In addressing that issue, the *Gomez* court stated that the first *Pierce* exception *may* apply to the categorical analysis of a proportionality challenge under the Eighth Amendment outlined in *Graham*—*if it would apply* in contexts other than sentences of death and life in prison without parole—because the factors involved in that analysis "are not case specific and generally raise questions of law." *Gomez*, 290 Kan. at 865-66. As the State points out, however, our Supreme Court explicitly did not *decide* either of these emphasized contingencies in *Gomez* because the defendant failed to adequately brief and, therefore, abandoned the Eighth Amendment issue. 290 Kan. at 866.

In sum, *Gomez* does not support Redmon's summary contention that this court can consider his constitutional challenge to his sentences for the first time on appeal. Redmon has not briefed any of the exceptions to the preservation rule. Accordingly, we find that Redmon has abandoned this issue by failing to comply with Rule 6.02(a)(5).

9

*The merits*

But even if we were to consider Redmon's Eighth Amendment contentions on the merits despite his noncompliance with Rule 6.02(a)(5), we believe that his categorical challenge should be denied. We note that a similar issue was heard by another panel of this court, which considered an almost verbatim argument made by a juvenile respondent sentenced as an adult to a hard 50 sentence in *Ellmaker v. State*, No. 108,728, 2014 WL 3843076, at *9-10 (Kan. App. 2014), *rev. denied* 302 Kan. 1009 (2015). Granted, *Ellmaker* is procedurally distinguishable in that the defendant raised the issue in a K.S.A. 60-1507 motion for habeas relief rather than his direct appeal. Nonetheless, we find that panel's reasoning persuasive in rejecting Ellmaker's contentions on two separate grounds.

First, the panel found Ellmaker's argument was based on the faulty premise that a hard 50 sentence imposed on a juvenile offender is the functional equivalent of a sentence of life without the possibility of parole. 2014 WL 3843076, at *10. As already mentioned above, in *Brown*, our Supreme Court relied on similar reasoning in rejecting a challenge to a hard 20 sentence imposed on persons who were under the age of 18 at the time they committed their crimes. 300 Kan. at 563-64. Other jurisdictions have similarly refused to extend the holdings in *Miller* and *Graham*. See, *e.g.*, *Bunch v. Smith*, 685 F.3d 546, 551-53 (6th Cir. 2012) (holding *Graham* inapplicable to term-of-years sentences and declaring that if the United States Supreme Court wishes to expand its holding, it must do so explicitly); *State v. Kasic*, 228 Ariz. 228, 232-34, 265 P.3d 410 (Ct. App. 2011) (declining to extend reasoning in *Graham* to aggregated consecutive term-of-years sentences for defendant's convictions of 32 felonies committed against multiple victims and defendant did not argue his individual sentences, viewed separately, were cruel and unusual); *Adams v. State*, 288 Ga. 695, 701, 707 S.E.2d 359 (2011) (holding *Graham* inapplicable to term-of-years sentences); *State v. Brown*, 118 So. 3d 332, 338-42 (La. 2013) (discussing "difficulty of applying *Graham* to non-life sentences" and declining to extend its reasoning to lengthy term-of-years sentences); *State v. Vang*, 847 N.W.2d 248,

262-63 (Minn. 2014) (holding *Miller* inapplicable to a life sentence with the possibility of parole in 30 years); *State v. Williams*, 352 Wis. 2d 573, 842 N.W.2d 536 (2013) (unpublished opinion) (recognizing *Miller* only applies to sentences of *mandatory* life without parole).

There is, however, a split of authority on this issue, with other jurisdictions extending the reach of the reasoning in *Graham* and *Miller* beyond sentences for the offenses discussed in those cases. See *People v. Caballero*, 55 Cal. 4th 262, 268, 145 Cal. Rptr. 3d 286, 282 P.3d 291 (2012) (holding that "sentencing a juvenile offender for a nonhomicide offense to a term of years with a parole eligibility date that falls outside the juvenile offender's natural life expectancy constitutes cruel and unusual punishment in violation of the Eighth Amendment"); *Casiano v. Commissioner of Correction*, 317 Conn. 52, 72-79, 115 A.3d 1031 (2015) (reasoning that juvenile's meaningful opportunity to obtain release requires that lengthy term-of-years sentence constitutes de facto life sentence, thereby triggering application of *Miller* sentencing protections relating to life sentences for juveniles); *State v. Null*, 836 N.W.2d 41, 72-74 (Iowa 2013) (same); *Bear Cloud v. State*, 334 P.3d 132, 141-43 (Wyo. 2014) (agreeing with *Null* court in extending *Miller* rationale to juvenile defendant's aggregated sentences that were functional equivalent of life without parole); accord *Brown v. State*, 10 N.E.3d 1, 8 (Ind. 2014) (holding that juvenile defendant's 150-year aggregate sentence for two counts of murder and one count of robbery is similar to life without parole and reducing aggregate sentence to 80 years).

Until the United States Supreme Court further extends its rationale in *Miller* and *Graham*, we believe it is reasonable for this court to following the *Ellmaker* panel's well-reasoned resolution of this issue. *Cf. Bunch*, 685 F.3d at 552 (raising possibilities of confusion and uncertainty that could result by expanding holding in *Miller* to term-of-years sentences imposed on juveniles by questioning what number of years might or might not constitute a de facto life sentence, whether race, gender, or socioeconomic

11

status would have to be considered, and whether number of crimes would matter). Thus, we are unwilling to hold that, as a matter of law, Redmon's 732-month aggregate sentence is a de facto sentence of life without the possibility of parole. Accordingly, it cannot be said to categorically violate the Eighth Amendment.

Further, the *Ellmaker* panel alternatively concluded that even if it were to find that Ellmaker's hard 50 sentence is the functional equivalent of a life sentence without parole for juveniles, the reasoning in *Miller* is not triggered. This is because "*Miller* bans only *mandatory* imposition of life without parole on a juvenile offender." *Ellmaker*, 2014 WL 3843076, at *10 (citing *Miller*, 132 S. Ct. at 2467, 2471). And Kansas' hard 50 sentencing scheme is not mandatory. Rather, it explicitly allows for individualized sentence decision making by allowing the sentence to be imposed only if the court finds the existence of aggravating circumstances that are not outweighed by any mitigating circumstances. *Ellmaker*, 2014 WL 3843076, at *10 (citing K.S.A. 21-4635[b]-[d]). At least one other court has taken a similar approach. See *State v. Cardeilhac*, 293 Neb. 200, 214-22, 876 N.W.2d 876 (2016) (finding it unnecessary to decide whether to adopt and apply sentencing process announced in *Miller* to lengthy term-of-years sentences imposed on juveniles where juvenile had full benefit of individualized sentence decision making prescribed by *Miller*). But other courts have disagreed. See *Casiano*, 317 Conn. at 72-73 (citing holding in *State v. Riley*, 315 Conn. 637, 658, 110 A. 3d 1205 [2015], that *Miller* implicates not only mandatory sentencing schemes, but also discretionary sentencing schemes that permit a life sentence without parole for a juvenile offender but do not mandate consideration of *Miller*'s mitigating factors).

We find the alternative reasoning of *Ellmaker* to be equally applicable to Redmon's sentence. Even if we were to hold that Redmon's aggregate sentences of 732 months are the functional equivalent of a life sentence without parole for juveniles, the trial court afforded Redmon the full benefit of the individualized sentencing considerations required by *Miller*. Before imposing the aggravated presumptive sentences

for Redmon's crimes, the trial court exercised its individualized sentencing jurisprudence by considering Redmon's motion for a downward dispositional or durational departure from the presumptive sentences, which included his mitigating qualities of his youth.

In sum, even acknowledging the extremely long sentence imposed by the trial court on Redmon, our interpretation of existing caselaw follows the same path as *Ellmaker*. Under both alternative theories, we cannot automatically conclude that Redmon's sentences constitute cruel and unusual punishment in violation of the Eighth Amendment.

*Illegal sentence*

As part of his first contention of error, and continuing with his contention that his 732-month sentence is the equivalent of life without the possibility of parole, Redmon also contends his sentence is illegal because it fails to conform to K.S.A. 2012 Supp. 21-6618. The State did not respond to this particular argument.

Under K.S.A. 22-3504(1), this court "may correct an illegal sentence at any time." Our courts interpret this to include an appellate court's *sua sponte* consideration of an illegal sentence. See, *e.g.*, *State v. Rogers*, 297 Kan. 83, 93, 298 P.3d 325 (2013). Thus, Redmon's failure to raise this issue below or to comply with Rule 6.02(a)(5) on this particular argument does not preclude consideration of the issue.

Our Supreme Court strictly defines an "illegal sentence" as

"(1) a sentence imposed by a court without jurisdiction; (2) a sentence that does not conform to the applicable statutory provision, either in the character or the term of authorized punishment; or (3) a sentence that is ambiguous with respect to the time and manner in which it is to be served." *State v. Trotter*, 296 Kan. 898, 902, 295 P.3d 1039 (2013).

13

Redmon contends his sentence, which he this time characterizes as "the functional equivalent of a life without parole or death sentence" is illegal because it does not conform to K.S.A. 2015 Supp. 21-6618. That statute directs:

> "Upon conviction of a defendant of capital murder and a finding that the defendant was less than 18 years of age at the time of the commission thereof, the court shall sentence the defendant as otherwise provided by law, and no sentence of death or life without the possibility of parole shall be imposed hereunder." K.S.A. 2015 Supp. 21-6618.

By its plain language, this statute has no application to Redmon, who was not convicted of capital murder. Accordingly, this statute has no effect on Redmon's sentence. Accord *Ellmaker*, 2014 WL 3843076, at *11 (rejecting same argument because defendant was convicted of first-degree murder, not capital murder).

In summary, we find Redmon is not entitled to relief under his first issue on appeal.

*Application of* Apprendi

In his second major issue on appeal, Redmon contends the trial court increased his potential punishment in violation of *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000), when it made factual findings under K.S.A. 2012 Supp. 38-2347(e) in authorizing his prosecution as an adult under K.S.A. 2012 Supp. 38-2347(f)(1).

In support of this argument, Redmon points out that if he would have been adjudicated for his crimes as a juvenile offender, his punishment could not have extended beyond his 23rd birthday, when the jurisdiction of the juvenile court terminates. See K.S.A. 2012 Supp. 38-2369(a)(1)(B). In contrast, he was sentenced as an adult to 732

14

months in prison. See K.S.A. 2012 Supp. 21-6804. Thus, Redmon contends that in making the factual findings necessary to authorize his prosecution as an adult, the trial court violated the mandate that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi*, 530 U.S. at 490.

Redmon did raise this issue below in a motion to have a jury hear and determine the State's motion to prosecute him as an adult. He does not tell us what remedy he seeks on appeal for this alleged violation. Notably, Redmon acknowledges that our Supreme Court has consistently held that judicial factfinding used to certify a juvenile to be tried as an adult does not run afoul of *Apprendi*. See *State v. Tyler*, 286 Kan. 1087, 1096, 191 P.3d 306 (2008) (holding judicial factfinding supporting decision to authorize adult prosecution for juvenile charged with first-degree murder did not violate juvenile's right to trial by jury because adult certification process was a jurisdictional determination, rather than a sentencing question); *State v. Jones*, 273 Kan. 756, 770, 47 P.3d 783 (2002) (same). In fact, our Supreme Court quite recently reaffirmed this position, holding: "The adult certification process under the Juvenile Justice Code is a jurisdictional determination, rather than a sentencing question. Therefore, the judicial factfinding necessary to certify a juvenile for adult prosecution does not run afoul of *Apprendi*." *State v. Potts*, 304 Kan. 687, Syl. ¶ 4, 374 P.3d 639 (2016). This court is duty bound to follow this precedent. See *State v. Belone*, 51 Kan. App. 2d 179, 211, 343 P.3d 128, *rev. denied* 302 Kan. 1012 (2015) (noting that absent some indication the Supreme Court is departing from its previous position, Court of Appeals is duty bound to follow Kansas Supreme Court precedent).

Redmon, however, attempts to distinguish his argument from the argument rejected in *Potts*, *Tyler*, and *Jones*. His argument is not easily followed so it is set out in full here.

"The issue presented in the instant case is distinguishable from that in *Jones* and *Tyler* as the issue being raised is not necessarily a challenge to the procedure by which the [S]tate determines which division of the court has jurisdiction over the juvenile offender, but a challenge to the procedure by which the court actually imposed a sentence greater than that authorized by the statute under which he was charged.

"*Jones* and *Tyler* considered whether a jury must determine whether defendant is to be tried as an adult. Such a proceeding does not deal with sentencing as did *Apprendi*. It is a jurisdictional determination rather than a sentencing option. (*Tyler*) As such, the judicial fact finding in order to certify the defendant to be tried in adult court does not run afoul of A[p]prendi. (*Jones*). However, in the instant case the defendant challenges the actual imposition of the sentence above the maximum sentence authorized by the facts found by the jury. It is not the decision as to whether to try the defendant as an adult or juvenile that requires a jury determination. It is not even the imposition of a sentence in adult court that requires a jury. It is conceivable that the court could have sentenced the defendant to an adult term of incarceration equal to the maximum sentence to which the defendant could have been sentenced as an adult. It is at the point that the Court relied upon facts which were not submitted to a jury in order to actually impose a sentence above the maximum sentence authorized by the statutes that apply to a minor that the Court ran afoul of *Apprendi*."

We are not persuaded by Redmon's attempts to distinguish his argument from the argument recently raised and again rejected in *Potts.* At its core, Redmon's argument challenges the procedure through which the court *authorized* the State to charge him as an adult. Once the State opted to do so, Redmon was at that point no different than any other adult defendant convicted by a jury of the same crimes—at least not for purposes of determining presumptive sentences under the Kansas Sentencing Guidelines Act, K.S.A. 2012 Supp. 21-6601 *et seq.*, without running afoul of *Apprendi*.

Accordingly, Redmon is not entitled to relief from his sentences based on this alleged *Apprendi* violation.

16

*Mistrial*

In his third issue on appeal, Redmon contends the trial court erred as a matter of law when it denied his oral motion for a mistrial after a jury question led to the discovery of an error in one of the charging instructions. The State responds that the trial court was well within its discretion when it denied Redmon's motion for mistrial and submitted a corrected instruction to the jury before it returned to its deliberations.

By statute, the trial court may, in its discretion "terminate the trial and order a mistrial at any time" where it finds, in pertinent part, that "termination is necessary because":

> "(a) It is physically impossible to proceed with the trial in conformity with law; or
>
> "(b) There is a legal defect in the proceedings which would make any judgment entered upon a verdict reversible as a matter of law and the defendant requests or consents to the declaration of a mistrial; or
>
> "(c) Prejudicial conduct, in or outside the courtroom, makes it impossible to proceed with the trial without injustice to either the defendant or the prosecution." K.S.A. 22-3423(1).

Absent an abuse of that discretion, this court will not disturb a trial court's decision on a motion for mistrial. Such an abuse will be found only where the decision is arbitrary, fanciful, or unreasonable or is based on an error of law or fact. *State v. Ward*, 292 Kan. 541, 550, 256 P.3d 801 (2011).

Before further addressing the parties' arguments, some additional background is necessary to provide context.

The instruction at issue here involved the aggravated robbery charge found in Count 2 of the information. For that count, the information charged, in pertinent part, that Redmon "did then and there unlawfully and without authority, *enter into or remain within* . . . [W.S.B.'s residence, while she was there] with the intent to commit a felony therein, to-wit:  Aggravated Robbery and/or Rape." (Emphasis added.) During the instruction conference, the trial court voiced concerns about a possible multiple acts problem if the jury was instructed on both of the emphasized elements. The State disagreed but elected to amend its proposed instruction to charge only that Redmon remained without authority in a building while W.S.B. was there with the intent to commit rape. Redmon did not object to this change.

The issue now before this court arises because the ultimate instruction given to the jury on the aggravated robbery charge (Instruction 7) did not contain the "remained within a building" language agreed to at the instruction conference. Instead, Instruction 7 read:

> "1.  The defendant *entered* a building.
> "2.  The defendant did so without authority.
> "3.  The defendant did so with the intent to commit rape therein.
> "4.  At the time there was a human being (W.S.B.) in the building.
> "5.  That this act occurred on or about the 7th day of June 2013, in Sedgwick County, Kansas.
> "The elements of rape are set forth in Instruction No. 8." (Emphasis added.)

Despite being given the opportunity to proofread the instructions before they were given, the parties did not discover this error until the jury sent a question to the court during its deliberations. Specifically, the jury asked:  "Count 2 #3 Definition of intent? As it applies to #3." The error was noticed as the parties debated how the court should respond to the jury's question—an issue not currently before this court. Redmon's counsel insisted a mistrial was the only remedy for this instructional error "given the fact that [the

18

jury had] already gone back to deliberate with those instructions." In support, Redmon's counsel argued there was no authority allowing the trial court to simply give another substitute Instruction 7 reflecting the "remained in a building, without authority" language after he had "acquiesced" to Instruction 7 as given.

The trial court denied Redmon's motion for mistrial and submitted a corrected Instruction 7 to the jury. In support, the trial court found it "quite clear [that] instruction number seven doesn't make sense in light of all of the evidence involved in this case," but the court did not "know where the jury's problem" was with the intent question. Noting its "duty and responsibility of correcting" the instructions to properly reflect the governing law, and the fact that Redmon's counsel had agreed during the instruction conference to the "remained within" language, the trial court chose to release the jury for the night to give it additional time to consider the issue.

The next morning, the trial court declared the issue "relatively simple," explaining, "[t]he instruction number seven, which the jury was given, was not the instruction agreed upon by the State and the Court" with no objection from Redmon. Thus, the court instructed the jury to disregard the original Instruction 7 and to deliberate on the corrected Instruction 7. The court also instructed the jury, "[A] defendant acts intentionally when it is the defendant's desire or conscious objective to do the act complained about by the State." Again, the propriety of that response is not an issue in this appeal.

Redmon contends that regardless of whether the district court was within its discretion, he did not receive a fair trial due to "the high probability of causing confusion in the jury when the elements of the crime are changed in the middle of the deliberations." In other words, he contends the instructional error cannot be deemed harmless. The State disagrees and urges this court to hold Redmon can show no prejudice.

We disagree with both parties and hold that the trial court did not commit any error in correcting element 2 of Instruction 7. It has long been the law in Kansas that

> "[w]here an erroneous instruction is included in the written charge of the court, and read to the jury, the court not only has the right, but rests under the duty, to withdraw the erroneous instruction from the consideration of the jury; and where this is done in such a manner that it must necessarily have been clearly understood by the jury, the error in the original draft of the instructions is cured." *State v. Wells*, 54 Kan. 161, Syl. ¶ 2, 37 P. 1005 (1894).

This is precisely what happened here. Thus, the trial court's correction of Instruction 7 never triggered the grounds for a mistrial under K.S.A. 22-3423.

Accordingly, we hold the trial court did not abuse its discretion in denying Redmon's motion for mistrial.

*Jury instruction on favoritism or sympathy*

In his fourth issue on appeal, Redmon complains about the trial court's failure to *sua sponte* instruct the jury: "You must consider this case without favoritism or sympathy for or against either party. Neither sympathy nor prejudice should influence you." See PIK Crim. 3d 51.07. The State responds that there was no error, let alone clear error, in the trial court's failure to give this no-sympathy instruction, patterned after what was once PIK Crim. 3d 51.07 because the instruction was neither legally nor factually appropriate.

Redmon admittedly did not request the instruction at issue here, so this court is limited to reviewing for clear error. See *State v. Smyser*, 297 Kan. 199, 204, 299 P.3d 309 (2013). In doing so, this court's first step is to decide, de novo, upon review of the entire record whether there was any error at all by considering whether the instruction at issue was both legally and factually appropriate. If so, then Redmon must firmly convince this

20

court the jury would have reached a different verdict without the error. See *State v. Clay*, 300 Kan. 401, 408, 329 P.3d 484 (2014).

Redmon concedes that the no-sympathy instruction found in PIK Crim. 3d 51.07 was long ago disapproved for general use and has been removed from the current version of the Pattern Instructions for Kansas (PIK Crim. 4th) in effect at the time of Redmon's trial. See *State v. Williams*, 299 Kan. 1039, 1044, 329 P.3d 420 (2014) (recognizing PIK instructions no longer provide for routine inclusion of no-sympathy instruction); *State v. Baker*, 281 Kan. 997, 1004-05, 135 P.3d 1098 (2006) (recognizing PIK Crim. 3d 51.07 disapproved for general use). Rather, our courts hold a district court should give the no-sympathy instruction only under very unusual circumstances where the court believes that the jury may be influenced by sympathy or prejudice. *Williams*, 299 Kan. at 1044.

Redmon argues the instruction was factually appropriate in his case just as it was in *State v. Rhone*, 219 Kan. 542, 548 P.2d 752 (1976). In that case, one of the victims was terminally ill and unable to travel to the courtroom to testify. Thus, the trial court traveled with the jury and court personnel to the burglary victim's home to take her testimony. On appeal, the defendant complained about the trial court's denial of his request for an instruction advising the jury not to give the victim's testimony any additional credibility because of the circumstances under which it was received. The *Rhone* court found no error because the trial court had given the jury the no-sympathy instruction and another pattern instruction on witness credibility. 219 Kan. at 545. According to Redmon, the circumstances of his case are analogous to those in *Rhone* because W.S.B. was "especially sympathetic" given her age and health concerns following the "particularly brutal" attack she endured. Redmon summarily proclaims that the trial court's failure to caution or remind the jury of its duty to put aside its sympathy and prejudice left the jury "without strong enough guidance" of its role and duties was clearly erroneous.

Our courts have consistently distinguished *Rhone* based on its unique facts. See *Baker*, 281 Kan. at 1004-05 (finding fact that victim defendant was accused of killing was paraplegic, depressed, and suffered extreme pain "not sufficiently unusual to require the trial court to give a sympathy instruction"); *State v. Holmes*, 278 Kan. 603, 635-36, 102 P.3d 406 (2004) (concluding incidents in which victim's family members began crying and had to be escorted from courtroom did not warrant no-sympathy instruction); *State v. Reser*, 244 Kan. 306, 316-17, 767 P.2d 1277 (1989) (finding circumstances of case, which involved 14-year-old victim raped and sodomized by her stepfather "are not unusual in the criminal courts").

We have found no case in which our appellate courts have found error where a trial court refuses to give the no-sympathy instruction. Instead, our courts generally recognize that an instruction patterned after PIK Crim. 4th 51.060, which directs in part that the jury is "to determine the weight and credit to be given the testimony of each witness," sufficiently guides the jury in its important tasks of weighing the evidence and assessing credibility. See *Reser*, 244 Kan. at 315-16 (approving use of PIK Crim. 2d 52.09 [now PIK Crim. 4th 51.060] and deeming language in PIK Crim. 3d 51.07 "objectionable in that rather than telling the jury what to do, it tells it what not to do"); accord *Williams*, 299 Kan. at 1044-45 (finding no abuse of discretion in giving of no-sympathy instruction; but even if court were to find instruction was not factually appropriate, there was no reasonable possibility that error contributed to verdict where "looking at the instructions as a whole, the jurors were told that it was their responsibility to determine the weight and credit to be given the testimony of each witness, that they had the right to rely upon common knowledge and experience with respect to matters about which a witness had testified, and that their verdict must be founded entirely upon the evidence admitted and the law as given in the court's instructions").

Likewise, we do not believe the facts in Redmon's case are at all analogous to those in *Rhone*. Nor are the circumstances of this criminal case sufficiently unusual to

22

firmly convince this court that the jury would have reached a different verdict had the trial court given a no-sympathy instruction. Accordingly, we hold Redmon is not entitled to a new trial based on the trial court's failure to *sua sponte* give the jury a no-sympathy instruction.

*Sufficiency of the evidence*

In his fifth and final issue on appeal, Redmon complains the evidence was insufficient as a matter of law to support his convictions. The State responds that Redmon's sufficiency argument inappropriately calls on this court to disregard its standard of review by viewing the evidence in a light most favorable to him and to reweigh the evidence and assess credibility in his favor.

When the sufficiency of evidence is challenged in a criminal case, the appellate court reviews all the evidence in the light most favorable to the prosecution. The conviction will be upheld if the court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt based on that evidence. In determining whether there is sufficient evidence to support a conviction, the appellate court generally will not reweigh the evidence or the credibility of witnesses. *State v. Williams*, 299 Kan. 509, 525, 324 P.3d 1078 (2014).

The State is correct: Redmon inappropriately invites this court to review and reweigh the evidence in a light most favorable to him. For example, Redmon characterizes the DNA evidence as "inconclusive" because the forensic scientist testified that he could not rule out the possibility that W.S.B. was one of the contributors to the DNA from three different persons found on the crotch area of Redmon's underwear. Redmon then points out that (1) he was not the only black man in W.S.B.'s house that night; (2) the other man in the home (Thompson) had semen inside his underwear; (3) the rapist wore fingerless gloves, which is inconsistent with the discovery of Redmon's palm

print; and (4) no forensic evidence placed Redmon in W.S.B.'s bedroom. Thus, Redmon contends the evidence was insufficient to find that he was the one who raped W.S.B., threatened to cut the ring off her hand or to kill her if she called the police, or took anything—particularly W.S.B.'s necklace and ring—from her person or presence.

By extension, Redmon argues the evidence was insufficient to prove he remained in W.S.B.'s house *with the intention to commit rape*. According to Redmon, the evidence showed, at best, that he was present in W.S.B.'s home. He then notes that "[w]ithout other incriminating evidence, the mere presence of [Redmon] in the vicinity of the crime in insufficient to establish guilt as a matter of law" (citing *State v. Green*, 237 Kan. 146, 149, 697 P.2d 1305 [1985]). And finally, Redmon briefly suggests the jury had to engage in impermissible inference stacking to find him guilty (citing *United States v. Jones*, 44 F.3d 860, 865 [10th Cir. 1995]).

The State counters Redmon's argument by highlighting the evidence it offered to show that Redmon was guilty of the crimes. But we need not reiterate the evidence already detailed above to resolve Redmon's sufficiency challenge. Within the constraints of the standard of review, we believe the State presented ample evidence to show Redmon's direct involvement in all the crimes charges against him. We therefor reject Redmon's challenge to the sufficiency of the evidence to support his convictions.

Affirmed.

24